1

2

3

4                              **UNITED STATES DISTRICT COURT**

5                                   **DISTRICT OF NEVADA**

6    CG TECHNOLOGY DEVELOPMENT, LLC,
     INTERACTIVE   GAMES   LIMITED,   and
7    INTERACTIVE GAMES LLC                              Case No. 2:16-cv-00856-RCJ-EJY

8         Plaintiff,                                    Member Case No. 2:16-cv-00871-RCJ-EJY

9    v.                                                              **ORDER**

10   888 HOLDINGS, PLC,

11        Defendant.

12

13        Plaintiffs brought this matter alleging Defendant 888 Holdings, PLC ("888 Holdings")

14   infringed several of Plaintiffs' patents relating to online gambling.  Pending before the Court is

15   Defendant 888 Holdings' Motion for Summary Judgment.  (ECF No. 191).  Plaintiffs have

16   responded.  (ECF No. 198).

17        Plaintiffs do not contest that 888 Holdings is entitled to summary judgment with respect to

18   its claims related to the RE39,818; 9,355,518; and 9,306,952 patents.  Accordingly, the only cause

19   of action remaining against 888 Holdings is Plaintiff Interactive Games, LLC's ("IG") claim that the

20   888 Casino and 888 Poker applications infringe Claim 17 of the 8,814,664 ('664) patent.  Having

21   considered the pleadings, the undisputed facts presented in the record, and the written and oral

22   arguments of the parties, the Court will grant 888 Holdings' motion.

23

24

# I.      PROCEDURAL HISTORY

Plaintiff CG Technology Development, LLC ("CG Tech") is a wholly owned subsidiary of non-party CG Technology, L.P. ("CG Technology"), which provides technology solutions for lottery, gaming, racing, and sports wagering.  (Am. Compl. ¶ 2, ECF No. 19).  "[CG Technology] specializes in providing secure, scalable, mobile technology and risk management solutions to integrated resorts, gaming partners, race and sports books, and lottery industries." (*Id*.).   CG Technology and CG Tech produce mobile phone applications for real-money and social casino gaming, as well as account-based wagering systems.  (*Id*.).

CG Tech is the assignee of U.S. Patent No. RE39,818.  Plaintiff Interactive Games Limited ("IG Ltd") is the assignee of U.S. Patent Nos. 6,966,832; 6,899,628; 6,979,267; 7,029,394; 8,342,924; and 9,111,417.  Plaintiff Interactive Games LLC ("IG") is the assignee U.S. Patent Nos. 7,534,169; 8,771,058; 8,814,664; 9,306,952; and 9,355,518.  Plaintiffs have sued 888 Holdings in this Court for direct and willful infringement via operation of 888 Holdings' various online casino games.

The Court has previously determined that the '832, '628, '267, '394, '924, '417, and '169 Patents are patent-ineligible under 35 U.S.C. § 101 and *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).  (ECF No. 54).

The claims of four of the other patents-in-suit asserted against 888 Holdings (RE39,818, '058, '952, and '518) were found invalid as a result of IPR proceedings initiated by parties other than 888 Holdings.  Those rulings are now final.  *See* Joint Status Report, ECF No. 69 filed in Case No. 2:16-cv-00871.  888 Holdings is, accordingly, asking that the Court enter summary judgment regarding these patents.  Plaintiffs have indicated they do not oppose this request.  Accordingly, the Court will grant summary judgment in favor of 888 Holdings for Plaintiffs' claims arising from the RE39,818; '058; '952; and '518 patents.

The only remaining claim against 888 Holdings is that its 888 Poker and 888 Casino online games infringe Claim 17 of U.S. Patent No. 8,814,664 (the '664 Patent) assigned to IG.  (ECF No. 19, Am. Complaint, ¶¶ 117-132).  Defendant argues that it is entitled to summary judgment because neither 888 Casino nor 888 Poker infringe Claim 17 under its common and ordinary meaning.

## II.     BACKGROUND[1]

Beginning in 2013, Defendant has operated state-licensed online and mobile casino real money gambling (RMG) platforms in New Jersey, Nevada, Delaware and Pennsylvania.[2] Registered and verified players using a mobile device that is physically located in an RMG location[3] can access Defendant's RMG platform through the Defendant's 888 Casino and 888 Poker applications.  The process for determining the mobile device's location, generally referred to as "geolocation," uses services and methods that are well-known in the industry.[4]  A geolocation is performed when a player launches either the 888 Casino or 888 Poker application on a mobile device.

In both applications, players can purchase virtual chips with real money.  If the mobile device is in an RMG location, players can access and play an RMG game, and place wagers allowing them to win virtual chips.  The players can then redeem their virtual chips for real money.

The 888 Casino and 888 Poker applications also offer free-to-play ("FTP") simulated gaming to registered and verified players.[5]  Players can access and play the FTP games on these applications

---

[1]     The following summary is of those facts which are either undisputed or, if disputed, are construed in favor of Plaintiffs as the non-moving party.

[2]     For brevity and consistency with the language used in patent claim, the Court will generally refer to these states as RMG locations.

[3]     Under its licenses, Defendant is required to verify that a mobile device accessing its RMG platform is physically located within the respective RMG jurisdiction.

[4]     Defendant contracts with a third party for this service.

[5]     888 Holdings has represented to the Court, and IG has not disputed, that it discontinued FTP gaming from its 888 Poker application on June 12, 2020.  For purposes of clarity and brevity only,

from anywhere in the United States; that is, both within and outside of RMG locations.   When playing an FTP game, players can only win FTP chips.  Players cannot redeem the FTP chips for real money or any other prize and cannot transfer their FTP chips to any third party.

**A. Application Behavior in an RMG location.**

When the applications are launched on a mobile device that is determined to be in an RMG jurisdiction, the Defendant's applications present the player with a lobby screen, similar to the following:



From this lobby screen, with the toggle switch set to Real Money, a player can select one of several available RMG games.  After the player starts an RMG game, the player can place wagers for real money.

A player can also make the initial selection necessary to access and play an FTP game by sliding the toggle bar to "Play Money."  After a player moves to the FTP gaming lobby, the player can select one of several available FTP games.  After the player starts an FTP game, the player can

___

the Court will discuss the claim against 888 Holdings' applications as if they both applications continued to offer FTP gaming.

place wagers for FTP chips.  Other than the initial geolocation performed when the applications are launched, the applications do not perform a geolocation when the player accesses the FTP lobby or an FTP game.

**B. Application Behavior in an FTP-only Location**

When the applications are launched on a mobile device that is determined to be in a location that does not allow real money wagers, the applications present the player with the same "lobby." The record does not indicate whether, outside of a real money gaming jurisdiction, the toggle switch is set to "Play Money" (as shown in the following screen) or whether it remains set to "Real Money."



Regardless of the default position of the toggle switch when the applications are launched, the applications allow a player to make the necessary selections to access and play an FTP game, and then allow the player to place wagers for FTP chips.  Other than the initial geolocation performed when the applications are launched, the applications do not perform a geolocation when the player accesses the FTP lobby or an FTP game.

However, if the player attempts to make a real money wager outside of an RMG location, both the 888 Casino and 888 Poker applications will block the attempt.  Instead, the player's mobile device will receive and display a "cease and desist" message similar to the following:



After receiving this message, the player is returned to the application's gaming lobby area.

In the 888 Casino application, players can play virtual slot machines, virtual scratch card games, virtual roulette, and virtual video poker.  Players can also play virtual blackjack, virtual table poker and virtual baccarat, though these latter games involve only the player and a virtual dealer.

The 888 Poker application is a virtual poker room in which players can engage in various virtual poker games against other human players.  The 888 Poker application permits players to select a virtual poker table at which to play.  The application presents the player with a lobby of available tables, providing details of the tables including the screen name of other players already seated at the table, in a display similar to the following:



When a player is seated at a virtual poker table, the 888 Poker application will show the screen name of the other players seated at the same table, with a screen similar to the following:



## C.  Claim 17 of the '664 Patent

Claim 17 of the '664 patent recites:

> 17. An apparatus comprising:
>
> a non-transitory medium having stored thereon a plurality of instructions that when executed by a computing device, cause the computing device to:
>
> > determine that a mobile device associated with a first player is located in a first location that is designated as a non-monetary, points only wagering area;
> >
> > in response to determining that the mobile device is located in the first location, automatically enable points wagering and automatically disable monetary wagering from the mobile device while the mobile device remains in the first location;
> >
> > receive, from the mobile device, a challenge by the first player, in which the challenge identifies an amount of points selected by the player and a second player selected by the player against whom to place the challenge;
> >
> > in response to receiving the challenge, identify the challenge to the second player;
> >
> > receive an acceptance of the challenge from the second player;
> >
> > in response to receiving the acceptance, form a wager between the first player and the second player based on the challenge;
> >
> > adjust points in an account of a winning player of the challenge in response to determining an outcome of the challenge;
> >
> > determine mobile device is located in a second location that is designated as a monetary wagering area; and
> >
> > in response to determining that the mobile device is located in the second location, automatically enable monetary wagering and automatically disable points wagering from the mobile device while the mobile device remains in the second location;
> >
> > wherein the second location is geographically different from the first location.

III.    **LEGAL STANDARDS**

   **A. Summary Judgment**

In considering a motion for summary judgment, the court performs "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012). To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2) that the court may grant judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Arango*, 670 F.3d at 992.

A material fact is one required to prove a basic element of a claim. *Anderson,* 477 U.S. at 248. The failure to show a fact essential to one element, however, "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. As such, when the non-moving party bears the initial burden of proving, at trial, the claim or defense that the motion for summary judgment places in

9

issue, the moving party can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  Conversely, when the burden of proof at trial rests on the party moving for summary judgment, then in moving for summary judgment the party must establish each element of its case.

Once the moving party meets its initial burden on summary judgment, the non-moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro. 56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).  As summary judgment allows a court "to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however, will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).  In this matter, Plaintiffs have the burden of demonstrating that there is a genuine issue of fact on "whether [Defendant's] accused device is encompassed by the claim[]." *Pitney Bowes, Inc.*, 182 F.3d at 1304.

**B.  Deferring Summary Judgment**

Under Federal Rule of Civil Procedure 56(d), a party opposing a summary judgment motion may request that a district court delay ruling on the motion in order to obtain additional discovery without which "it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d).  The party seeking relief must support its request with an affidavit or declaration.  *Id., see also Michelman*

*v. Lincoln Nat. Life Ins. Co.*, 685 F.3d 887, 899 (9th Cir. 2012).  Rule 56(d) "provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence."  *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002).  The requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment.  *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008).  If the requesting party makes such a showing, the Court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).

**C. Patent Infringement**

"[I]n every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Fantasy Sports Props.v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002).  "[T]o infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating' in the described mode."  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (quoting *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 832 (Fed. Cir. 1991)).  Software is "reasonably capable" of performing a recited capability if it is written such that the code, if executed without modification, would cause the computer to execute the recited capability, regardless of whether the relevant code "is activated or utilized in any way."  *Fantasy Sports*, 287 F.3d at 1118.  However, the reasonable capability test does not apply where the "claim language clearly specifies a particular configuration."  *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009).  Rather, "infringement occurs only if the accused product is configured" as specified in the claim.  *Id.*

"Claim terms are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016).

## IV.   ANALYSIS

### A.  Rule 56(d) Request

IG has not met its burden of demonstrating that the Court should defer, deny, or otherwise issue an appropriate order regarding the pending motion for summary judgment pursuant to Rule 56(d).  In support of their request, IG asserts that the parties dispute the plain and ordinary meaning of certain claim terms.  This argument does not warrant relief because 888 Holdings has agreed that, for purposes of their motion, IG's proffered "plain and ordinary meaning" for each of the claim terms at issue should govern.

IG also asserts that their expert requires "further source code review to investigate 888[ Holdings'] non-infringement theories and the uncontroverted statements made in the Sherman declaration and analyze differences in the source code of the accused platforms since this litigation was stayed in 2017."  In support, IG offers only the affidavit of its former counsel who generally only repeats this language.  IG has not shown how an analysis of the differences in the source code since this litigation was stayed is essential to its opposition.  IG has also not shown that further source code review to investigate the uncontroverted statements made by Sherman in his declaration is essential to its opposition.  The only example cited by former counsel is to paragraphs 13 and 14 of the Sherman declaration.  Sherman's statements concern user inputs to engage in RMG, not the code.  IG has disputed the accuracy of this statement as applied to at least one circumstance.  However, the accuracy of Sherman's statements can be readily determined through observation of the applications by any person using the applications.  Indeed, IG's expert has relied upon a screenshot of the 888 Poker application to assert that the applications apply a default position to the

toggle switch in the lobby when launched on a mobile device that is in an RMG location.  Neither IG's former counsel nor its expert offers any explanation as to why source code review is required to dispute Sherman's statements in paragraphs 13 and 14 of his declaration.  Finally, further evidence regarding the user input discussed by Sherman in these paragraphs is not essential for IG's opposition.  IG had sufficient evidence to support its dispute and the Court has, for purposes of this summary judgment motion, construed the behavior of the applications in favor of IG, and has assumed that the application behaves in the manner that IG has represented to the Court.

IG's assertion that its expert requires further source code review to investigate 888 Holdings' non-infringement theories is a general, rather than a specific, statement of facts that IG hopes to elicit from further discovery.  Undoubtably, evidence regarding the source code for 888 Holdings' application is relevant to IG's claim.  However, IG has only requested further review of the source code without identifying the specific facts to be elicited from that discovery.  888 Holdings notes that IG's expert was provided, and engaged in, an initial two days of access to the source code that IG had requested.  IG then identified additional source code for review by its expert.  888 Holdings provided, and the expert engaged in, an additional two days of access to and review of the additional source code.  888 Holdings also provided IG's expert with 440 pages of printed source code.  Following that production, and before this matter was stayed, IG did not identify or request that 888 Holdings produce any additional source code for review by its expert.

The Court also notes that, in his declaration, IG's expert does not assert that he requires additional access to IG's source code or that he requires additional printed pages of source code.  Rather, he offers only the general assertion that he has not had an opportunity to *complete* his review.  Under these circumstances, the Court finds that IG has not set forth the specific facts its hopes to elicit from additional discovery regarding 888 Holdings' source code.  As a result, IG has necessarily

failed to establish that undiscovered facts concerning the source code exist that are essential to its defense.

Finally, IG asserts that it requires additional discovery, primarily Rule 30(b)(6) depositions, on "various subjects," which it then broadly outlines. This broad outline of subjects does not satisfy the requirement that IG set forth the specific facts that it hopes to elicit from further discovery. Again, having failed to identify the specific facts to be elicited from additional discovery, IG fails to establish that the facts essential to its opposition exist.

**B. 888 Holdings' Accused Products**

Claim 17 of the '664 patent is an apparatus claim. Specifically, IG claims "[a]n apparatus comprising: a non-transitory medium having stored thereon a plurality of instructions that when executed by a computing device, cause the computing device to" perform various specified functions. However, as suggested by the parties' written and oral arguments, Claim 17 is, in practical terms, a claim concerning the software code for a computer program or application.[6] Plaintiff asserts that the software code for the 888 Casino and 888 Poker applications infringes Claim 17.

Because Claim 17 is an apparatus claim for an application that *causes* a computer to perform several specified functions, it is a claim that "recites capability and not actual operation." Accordingly, at issue is whether the 888 Casino or 888 Poker applications, as coded, are "reasonably capable" of performing each limitation as recited in Claim 17, not whether they use or even activate the code that would execute each limitation.

---

[6] Strictly speaking, Claim 17 is for a computer program that is *stored* on a non-transitory medium. The parties do not dispute that 888 Holdings' 888 Casino and 888 Poker applications are stored on a non-transitory medium. Further, both parties generally identify the accused products as being the 888 Casino and 888 Poker applications without reference to the storage of those applications on a "non-transitory medium." Accordingly, for consistency and brevity, I will also treat these applications as being the accused products.

At the outset, the Court notes that IG has the burden of raising a triable issue of fact whether the code includes instructions that, when executed, would meet the Claim 17 limitations.  IG has not, however, offered any code into evidence to meet that burden.  Neither has IG offered expert opinion that specifically relies on the software code.  To be certain, this failure to offer direct evidence of infringing code is not, of itself, fatal to IG's opposition.  IG can meet its burden by proffering evidence from which inferences can be drawn that raise triable issues of fact whether the applications' software code include instructions that meet Claim 17.  IG relies solely on the behavior of the applications, as would be observed by a person using the applications on a mobile device.  Similarly, IG's expert relies on the observed behavior of the applications in forming his opinions.  Accordingly, as the instructions included in software code are not in the record, the issue before the Court is whether the actual behavior of the applications raises a permissible inference that the software code for the applications include sets of instructions that infringe Claim 17.

**C. The Geolocation Limitations**

888 Holdings asserts that its products do not infringe the Claim 17 limitation for applications that "automatically enable monetary wagering and automatically disable points wagering."  However, in making this argument, 888 Holdings argues that the "basic facts concerning the operation of 888 Casino and 888 Poker . . . makes it clear that the location of the user device during FTP games is not being determined."   The argument is irrelevant on the issue whether the applications infringe the "automatically enable monetary wagering and automatically disable points wagering" limitation.

Claim 17 does recite an FTP geolocation limitation: "determine that a mobile device associated with a first player is located in a first location that is designated as a non-monetary, points only wagering area;" and an RMG geolocation limitation: "determine mobile device is located in a second location that is designated as a monetary wagering area."  Neither geolocation limitation, nor

15

any other limitation in Claim 17, requires that a geolocation must be performed during FTP gaming. The issue is not whether the applications geolocate the mobile device during FTP gaming but whether they are reasonably capable of performing a geolocation in both an FTP and an RMG location.

888 Holdings acknowledges facts showing that both applications are reasonably capable of meeting both geolocating limitations: the applications will "initial a location verification request" when a player "manually selects 'Real Money' gaming using a virtual toggle." 888 Holdings acknowledges that a player can initial this request in an RMG location. As monetary wagering is permitted in RMG locations, the player can engage in monetary wagering on the applications. If a player initials this request in an FTP location, the applications will display the "cease and desist" notice and preclude the player from monetary wagering. Accordingly, both applications are reasonably capable of performing both the FTP and the RMG geolocation limitations.

**D. The "Automatically Enable Monetary Wagering and Automatically Disable Points Wagering" Limitation.**

Claim 17 includes the following limitation: "in response to determining that the mobile device is located in [an RMG] location, automatically enable monetary wagering and automatically disable points wagering from the mobile device while the mobile device remains in the [RMG] location."

For purposes of its summary judgment motion, 888 Holdings has agreed in its reply to the "plain and ordinary meaning" proffered by IG for claim terms. The parties agree that the claim term "automatically" should be construed to mean "without player input." They also agree that "enable" should be construed to mean "to cause to operate, activate," and that "disable" should be construed to mean "to make ineffective or inoperative, deactivate." IG further notes, in its opposition brief, that the Cambridge Online Dictionary defines "disable" as: "to turn off a part of a computer system,

or stop it from working in the normal way," and that the Macmillan Online Dictionary defines "disable" as: "to stop a machine or piece of equipment from working properly."

This limitation has three parts, each of which must be satisfied to find that the 888 Casino and 888 Poker applications meet the limitation. While Claim 17 is stated as a claim for an apparatus with several specified capabilities, this limitation within Claim 17 recites a configuration of functions that must be performed as specified in response to a specified event. To show that 888 Holdings' applications meet the first element of the limitation—the "in response" clause—IG must show that the applications actually perform this limitation whenever the mobile device performs a geolocation and determines the mobile device is in an RMG location.

To meet the second element of the limitation, the "automatically enable" element, the application must "automatically enable monetary wagering . . . from the mobile device while the mobile device remains in the [RMG] location." To meet the third element of the limitation, the "automatically disable" element, the application must "automatically disable points wagering from the mobile device while the mobile device remains in the [RMG] location." Further, IG must raise a triable issue that, each time the applications determine that the mobile device is in an RMG location, the applications respond (without any player input) by executing code that operates or activates monetary wagering *and* executing code that deactivates or makes FTP wagering inoperative from the mobile device while the mobile device remains in the RMG location. IG cannot meet its burden by merely showing that Defendant's applications are reasonably capable of automatically enabling monetary wagering. Neither can IG meet its burden by merely showing that the applications are reasonably capable of automatically disabling FTP wagering. IG must show the applications automatically enable monetary wagering *and* automatically disable points wagering from the mobile device *while the mobile device remains in the RMG location* and that the

1  applications actually do so in response to a determination that the mobile device is in an RMG

2  location.

3     IG has not raised a triable issue of fact that, in response to determining that a mobile device

4  is in an RMG location, 888 Holdings' applications automatically disable FTP wagering from a

5  mobile device while the mobile device remains in the RMG location.

6     888 Holdings argues that the fact that its applications do not automatically disable FTP

7  wagering is demonstrated by the example of a player who playing an FTP game on its applications

8  and who travels from an FTP location to an RMG location while continuing to play the FTP game.

9  In this circumstance, the applications do not automatically disable the player from continuing to play

10 the FTP game, and from continuing to make FTP wagers, even though the mobile device has moved

11 into an RMG location.

12    IG is correct that 888 Holdings' example is flawed because Claim 17 does not recite any

13 circumstance that requires an application to perform a geolocation function.  The failure to stop the

14 player from continuing to engage in FTP wagering when moving into an RMG location does permit

15 an inference that (a) the movement of a mobile device triggers geolocation, (b) as a result of a

16 geolocation in an RMG location, the applications determine that the mobile device is in an RMG

17 location, but (c) in response, the applications did not automatically disable FTP wagering.  However,

18 the failure to stop FTP wagering also raises the inference that the movement of a mobile device does

19 not trigger a geolocation.  Thus, the requirement to automatically disable FTP wagering in response

20 to a geolocation that shows the mobile device is in an RMG location was never triggered.  Further,

21 this latter inference is more plausible given that 888 Holdings, itself, argues that its applications

22 *never* perform a geolocation when a player is engaged in FTP gaming.

23    However, while 888 Holdings' specific example is flawed, its underlying argument is not.

24 IG has asserted, and the Court has accepted as true for purposes of the summary judgment motion,

that (1) 888 Holdings' applications always perform a geolocation when launching, and (2) the applications automatically open to the lobby with the toggle switch set to "Real Money" when they are launched in an RMG location.

In its opposition brief, IG asserts that 888 Holdings' "system, without any user input whatsoever, enables users to wager on free-to-play or FTP games" when the mobile device is determined to be in an FTP location.  IG does not reference any evidence of the behavior of the applications from which this inference that FTP wagering has been automatically enabled can be drawn.  Rather, IG cites only to the declaration of their own expert.  IG's expert opines that Defendant's system "activates or permits the operation of points wagering so that a user *can enter to wager on free-to-play* (FTP) games."  Opposition Exhibit A, Zatkovich Declaration at ¶ 33.  As such, construed liberally in favor of IG and pursuant to the opinion of IG's expert, the behavior of the applications that raises the inference that FTP wagering has been automatically enabled in response to a geolocation event is a player's subsequent ability to "enter to wager on free-to-play (FTP) games," regardless of whether the player must provide some input to the applications prior to being able to place a wager.

IG's expert opines that, in response to a geolocation in an FTP location, 888 Holdings' applications automatically disable "the function that permits users to wager on real money games." The expert bases this opinion only on the undisputed fact that the applications display the "cease and desist" notice in response to an attempt to place a real money wager in an FTP location.  As such, pursuant to the opinion of IG's expert, the behavior of the applications that raises the inference that monetary wagering has been automatically disabled is that a player is unable to place a monetary wager from the application.

IG's expert opines that 888 Holdings' applications "are capable of performing the function of automatically enabling monetary wagering" in an RMG location in response to a geolocation

event.   In support of this opinion, IG's expert relies solely on the applications' behavior of "allow[ing] the function of wagering on real-money games."   Thus, construed liberally in favor of IG, pursuant to the opinion of IG's expert and pursuant IG's assertion that the applications always perform a geolocation when launching, the behavior of the applications that raises an inference that monetary wagering has been automatically enabled in response to a geolocation event is that a player is allowed to engage in monetary wagering, regardless of whether the player must provide some input to the applications prior to being able to actually place a monetary wager.

IG's expert opines that the applications disable FTP wagering in an RMG location in response to a geolocation event.  However, in support of this opinion, the expert relies solely on the applications' behavior of displaying the lobby screen with the toggle button in the "Real Money" location.  The expert's only explanation is that the toggle button is "binary" and that a person of ordinary skill in the art "would understand that enabling or disabling a function or feature does not necessarily mean permanently enabling or disabling that function or feature."  The latter explanation is irrelevant.  The limitation requires that FTP wagering be automatically disabled "from the mobile device while the mobile device remains in the [RMG] location."   Regardless of whether the automatic disabling of FTP wagering must "permanent" or "temporary," IG must establish that the function is disabled "from the mobile device while the mobile device remains in the [RMG] location."

In addition, the expert's explanation that the toggle switch is binary because the binary nature of the toggle switch does not raise an inference that FTP wagering has been automatically disabled from the mobile device.  Pursuant to the other opinions of IG's expert, the behavior of the applications that raises an inference that the applications automatically enabled or automatically disabled a wagering function *in response to a geolocation event* is the subsequent ability of the player to engage the respective form of wagering.  This is regardless of whether the player was

required to provide additional input *after* the geolocation event but before the player could actually engage in wagering. The binary nature of the toggle switch establishes only that the player must provide some input to the applications before wagering. Such input is, pursuant to the expert's other opinions, irrelevant in determining whether the applications have automatically enabled or disabled wagering in response to the geolocation event.

The undisputed evidence in the record is that a player can place an FTP wager in 888 Holdings' applications after they are launched in an RMG location. IG has asserted, and the Court has accepted as correct, that the applications perform a geolocation event prior to any player input. As such, the only inference from the applications' behavior after launching in an RMG location that is consistent with the expert's opinions regarding automatically enabling wagering and automatically disabling monetary wagering in response to a geolocation event is that the applications automatically enable FTP wagering in response to determining that the mobile device is in an RMG location. Conversely, the undisputed evidence, when construed pursuant to these opinions of IG's expert, does not raise an inference that 888 Holdings' applications automatically disable FTP wagering in response to a geolocation event in an RMG location. As IG has not raised a triable issue of fact that the applications meet the "automatically enable monetary wagering and automatically disable points wagering" limitation, 888 Holdings' is entitled to summary judgment in its favor.

### E. The Limitation that the Apparatus Receive a Challenge by a Player that Identifies "a Second Player Selected by the Player."

Summary judgment in favor of 888 Holdings is also appropriate as to the 888 Casino application because that application does not infringe the limitation that the application be capable of "receiv[ing], from the mobile device, a challenge by the first player, in which the challenge identifies an amount of points selected by the player and a second player selected by the player against whom to place the challenge."

888 Holdings asserts that, in its 888 Casino application, the slots, video poker, scratch cards, and roulette games are solitary games; that is, the game is not played against another opponent.  The 888 Casino application also offers virtual casino table games, including blackjack, baccarat, and variations of poker.  In blackjack and poker, the player plays his hand against the hand dealt to a dealer.  In baccarat, the player plays the outcome of two hands, one dealt to the banker and one dealt to the player.  None of the 888 Casino games are played against a second player.

IG counters that a second player can be non-human and can be the "house."  It further asserts that the selection of the second player can be inferred from the wagering option made by the first player.  For purposes of this motion, the Court will assume IG's assertions are correct.

The issue is not whether the 888 Casino *games* are played solitary, but whether a player's *wager* on the outcome of each game is solitary.  In the physical world, a slot machine is a machine that generates an outcome of random symbols on several dials to create a combination of symbols.  The game is played solitary as there is no opponent to a person's act of causing the machine to generate a combination of symbols.  In addition to generating a random event, slot machines can have a second set of functions.  Two parties can use the slot machine to wager their assets on the outcome with one party (the house) offering a wager that certain outcomes will not occur and the other party (the player) wagering that they will.  The house can use a slot machine to offer the house's wager to patrons.  Patrons can use the slot machine to accept the house's wager.  The house can also use the slot machine to temporarily store assets won from losing patrons and to automatically pay the house's assets to winning patrons.  Despite these additional capabilities, the slot machine is not the house.  The house is the opponent to the wager.

However, a player's wager on the outcome of a slot machine can be solitary; a wager between a house and a patron is not *required* for a person to play a slot machine.  In the physical world, a person can own and play their own slot machine, wagering against themself.  That a person is playing

22

a slot machine and placing wagers does not, by itself, raise an inference that a person is wagering against a second player—the house—on the outcome generated by the slot machine.

Similarly, in the physical world, a person can go to a casino to play blackjack against the house.  However, a person can play blackjack solitarily, acting as both dealer (dealing cards according to specific and set rules) and patron capable of making decisions regarding their hand.  In such a solitary game, the person can wager points on each hand, keeping track of points won or lost with pencil and paper.  Points won are nothing more than the creation of the person's imagination, effectively acting as nothing more than a scorecard.  Again, evidence that a person is playing blackjack and placing wagers for points does not raise an inference that the person is wagering for those points against a house that is betting the house's points.

IG has not offered evidence raising a triable issue that the 888 Casino application is other than a virtual simulation of solitary games in which a person places solitary wagers (that is, wagers against themselves) with FTP chips that are created from nothing and exist only in a first player's account.  IG asserts, in its opposition, that "when the first player plays a round of video poker, the first player specifically chooses to challenge the house (i.e., the second player).  The house is an identifiable opponent that is specifically chosen by the first player."  IG does not, however, cite to any evidence in the record raising the inference that there is a "house" in the video poker game or any 888 Casino game; that is, a second player with an account of FTP chips that wagers those chips against the first player on the outcome of each game played by the first player.  Neither does IG offer any evidence that, in any 888 Casino game, the "house" is an identifiable opponent.  IG does not even offer evidence that the 888 Casino application can be used by a house to wager the house's FTP chips against persons playing 888 Casino games.

IG asserts that 888 Holdings "admits that the first player places wagers against the house for a certain number of points."  888 Holdings makes no such admission.  In its moving papers, 888

Holdings asserts only that "the player wagers on the outcome of his or her hand as against the dealer's hand." The dealer's hand is not the house. Instead, 888 Holdings represents that "none of the 888 Casino games permit the player to select a second player to wager against (and, indeed, none even include a second player to wager against)" and "[n]one of these games permit a player to wager against any second player."

The Court recognizes that 888 Holdings states that a player using the 888 Casino application wagers on the outcome of events in its games. 888 Holdings use of this term does not raise a triable issue of fact. IG has the burden of raising a triable issue that players of 888 Casino games can place place wagers for FTP chips against a second player that has an account of FTP chips to be wagered, and who wagers those chips against the first player. The record, however, permits only the inference that a person using the 888 Casino application to place wagers for FTP chips is doing so as the virtual equivalent of playing a solitary game with pencil and paper in which FTP chips are created out of nothing and are useful only as a means of keeping score—each player's FTP chips exist only when they are in the account of that player and are destroyed when deducted from that player's account.

A closer question exists whether the 888 Poker application is capable of receiving challenges that identify a second player. As 888 acknowledges, this application is a virtual poker room that allows players to engage against other players at a virtual table. 888 Holdings argues that Claim 17 requires a player to challenge a second player, but that in poker a wager in a hand is directed at everybody at the table. IG counters that directing a wager at all players sitting at a poker table is a challenge that selects those players. While the 888 Poker application involves challenges between two players with accounts holding FTP chips, the arguments of the parties suggest that extrinsic evidence will need to be considered, including the prosecution history, to determine whether IG has raised a triable issue that the second player is selected by the first player. Accordingly, the Court

will not make a determination at this time whether IG has raised a triable issue of fact whether the 888 Poker application meets the "second player selected by the player" limitation.

## V.    PLAINTIFFS' CLAIMS AGAINST THE BWIN.PARTY DEFENDANTS

In August 2017, this matter became the base file for consolidated pre-trial proceedings regarding Plaintiffs' several different patents for claims brought in Case No. 2:16-cv-00871-RCJ-EGY, *CG Technology Development LLC et al* v. Bwin.Party Digital Entertainment, PLC; Bwin.Party (USA), Inc.; and Bwin.Party Entertainment (NJ), LLC.   The Court notes that the Bwin.Party defendants observed, but did not participate, in the motion for summary judgment brought by 888 Holdings.   In light of this order being dispositive as to Plaintiffs' claims against 888 Holdings, and to permit the Court to effectively manage its docket, if any of the parties to Case No. 2:16-cv-00871-RCJ-EJY wish to bring a motion related to the issues raised in 888 Holdings' summary judgment motion, they must do so no later than 10 days after the date this Order is entered.

### CONCLUSION

IT IS HEREBY ORDERED that Defendant 888 Holdings, Inc.'s Motion for Summary Judgment (ECF No. 191) is GRANTED.   The Clerk of the Court shall enter summary judgment in favor of Defendant 888 Holdings and against Plaintiffs CG Technology Development, LLC, Interactive Games Limited, and Interactive Games LLC, with costs awarded in favor of Defendant 888 Holdings and against Plaintiffs.

IT IS FURTHER ORDERED that, to permit the Court to effectively manage its docket in these consolidated pre-trial proceedings, the parties to 2:16-cv-00871-RCJ-EJY, *CG Technologies Development, LLC, et al.* v. Bwin.Party Digital Entertainment, PLC *et al*, must bring any pertinent

///

///

///

25

motions arising from or related to the issues asserted in 888 Holdings' Motion for Summary
Judgment no later than 10 days from the date this Order is entered.

      IT IS SO ORDERED.

Dated: March 1, 2022

                                _____
                                  ROBERT C. JONES
                                  United States District Judge